IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBRAANNE DEFRANCESCO, | : | CIVIL ACTION NO. **3:CV-05-713** |
| | : | |
| Plaintiff | : | (Judge Munley) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| JOANNE B. BARNHART, | : | |
| Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant | : | |

**REPORT AND RECOMMENDATION**

This is a Social Security disability case pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), wherein the Plaintiff, Debraanne DeFrancesco, is seeking review of the decision of the Commissioner of Social Security (Commissioner) which denied her claim for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI, respectively, of the Social Security Act (Act). 42 U.S.C. §§ 401-433, 1381-1383c.

**I.  PROCEDURAL HISTORY.**

The Plaintiff protectively filed applications for DIB and SSI on April 10, 2003, alleging disability since March 25, 2003 due to bipolar disorder, fibromyalgia, and osteoarthritis. (R. 13, 65-68, 112). The state agency denied the Plaintiff's claims initially, and, upon Plaintiff's request, a hearing was held on August 4, 2004 before an administrative law judge (ALJ). (R. 20, 22, 28-31, 492-98). The Plaintiff, her mother, and a vocational expert (VE) testified at the hearing. (R. 513-551). On September 24, 2004 the ALJ issued a decision finding that Plaintiff was not disabled. (R. 9-19). The Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the

final decision of the Commissioner.  (R. 5-8).  42 U.S.C. § 405(g) (1995).  That decision is the subject of this appeal.

In compliance with the Procedural Order issued in this matter, the parties have filed briefs in support of their respective positions.  (Docs. 10 and 13).

## II. STANDARD OF REVIEW.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999).  It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy"

> means work which exists in significant numbers either in the
> region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

## III.  ELIGIBILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920 (1990).  *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.  20 C.F.R. §§ 404.1520, 416.920 (1995).

The first step of the process requires the Plaintiff to establish that she has not engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b) (1995).  The second step involves an evaluation of whether the Plaintiff has a severe impairment.   *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).  The Commissioner must then determine whether the Plaintiff's impairment or combination of impairments meets or equals those listed in Appendix 1, Subpart P, Regulations No. 4.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If it is determined that the Plaintiff's impairment does not meet or equal a listed impairment, the Commissioner must continue with the sequential evaluation process and consider whether the Plaintiff establishes that she is unable to perform her past relevant work.  *See* 20 C.F.R. §§ 404.1520(d)-(e), 416.920(d)-(e).  The Plaintiff bears the burden of demonstrating an inability to return to her past relevant work.  *Plummer*, 186 F.3d at 428.  Then the burden of proceeding shifts to the Commissioner to demonstrate that other jobs exist in significant numbers in the national economy that the Plaintiff is able to perform, consistent with her medically determinable impairments, functional limitations, age, education and work experience.  20 C.F.R. §§ 404.1520(f),

416.920(f).  This is step five, and at this step, the Commissioner is to consider the Plaintiff's stated vocational factors.  *Id.*

The ALJ proceeded through each step of the sequential evaluation process and concluded that the Plaintiff was not disabled within the meaning of the Act.  (R. 26).  At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful work activity since her alleged onset date.  (R. 13).  At steps two and three, the ALJ concluded from the medical evidence that Plaintiff's fatigue, fibromyalgia, and bipolar disorder are severe within the meaning of the Regulations, but do not meet or equal, either singly or in combination, the criteria for establishing disability under the listed impairments as set forth in Appendix 1, Subpart P, Regulations No. 4. (R. 14).  At step four, the ALJ found that Plaintiff could not return to her past relevant work.  (R. 16-17).  Finally, at step five, the ALJ found that Plaintiff retained the residual functional capacity (RFC) to perform a significant range of light work as defined in 20 C.F.R. §§ 404.1567 and 416.967.  (R. 17).  Thus, Plaintiff was found to be not disabled within the meaning of the Act.  (R. 18).

## IV.  DISCUSSION.

### A. Background

#### 1.  Factual background

The Plaintiff, forty-one years old at the time of the ALJ's decision, is considered a "younger" individual under the regulations.  (R. 13).  20 C.F.R. § 416.963(c) (2004).  She lives with her parents and has a high school education.  (R. 94, 118).  The Plaintiff has past work experience as a nursing assistant, a massage therapist, and an electronics assembler, jobs described by the VE

as semi-skilled and light to medium in exertional nature.  (R. 13, 118, 547).  She had not worked since March 23, 2003, two months after slipping and falling at work.  (R. 112, 135).

The Plaintiff has stated that lifting, pulling, pushing, bending, walking, standing, and temperature extremes cause her pain. (R. 83).  The Plaintiff testified that walking and sitting for too long increase the pain in her back, which she described as constant.  (R. 526-27).  She testified that she did not think she would be able to sit or stand for four hours. (R. 533).  The Plaintiff has stated that her memory is impaired, and that her mother has to give her medication or she will forget to take it.  (R. 82, 529).  She also claims trouble dealing with change, making decisions on her own, and concentrating.  (R. 82, 533).

## 2.  Medical history

Baxter Wellman II, D.O., the Plaintiff's primary care physician, diagnosed bipolar disorder, anxiety disorder, and fibromyalgia in November 2002. (R. 161-62).  Within a few weeks, on November 26, 2002, Dr. Wellman noted that the Plaintiff's anxiety was better since starting medication, and told her to return in six weeks.  (R. 160).  On March 4, 2003, however, Dr. Wellman stated that the Plaintiff's anxiety and bipolar disorder were suboptimal despite treatment with medication.  (R. 154).  On March 7, 2003, the Plaintiff went to the emergency room complaining of anxiety; she was given Xanax. (R. 185).  The Plaintiff went to the emergency room again on March 14, 2003, again complaining of panic attacks.  (R. 186).  The Plaintiff was given Ativan.  *Id.*  On March 18, 2003, Dr. Wellman noted that the Plaintiff had been involved in three separate car accidents and that the Plaintiff had been tested for intoxication.  (R. 153).  He noted

concern about the Plaintiff mixing alcohol and medication such as Vicodin, Ativan, and Xanax with alcohol and driving.  (R. 152).

The Plaintiff began treatment with Eric M. Levin, M.D.P.C., for depression and bipolar disorder in March 2003.  (R. 199-205).  The Plaintiff was anxious and depressed, but she denied suicidal or homicidal ideations and hallucinations.  (R. 203).  Dr. Levin diagnosed bipolar disorder, not otherwise specified (NOS), drug abuse in remission and personality disorder, NOS, mixed.  (R. 205).  He rated her current global assessment of functioning (GAF) as sixty.  (R. 205).

From March through June 2003, the Plaintiff's diagnosis and GAF rating remained constant. (R. 427-34).  In April 2003, Dr. Levin observed that the Plaintiff was over-medicated due to an abuse of her medications; in several subsequent notations, he described  her as "sedated."  (R. 428).  Despite continued symptoms, the Plaintiff reported some improvement with medication. (R. 429).  Dr. Levin continued to prescribe and adjust her medication, which was administered by her mother, but suspected that the Plaintiff was pressuring her mother to give her more than was prescribed.  (R. 427-34).

In June 2003, the Plaintiff met with Cinda Liggon, M.D., for a single psychiatric evaluation. (R. 388-92).  Dr. Liggon observed that the Plaintiff was oriented with appropriate grooming and dress and had normal speech, coherent thoughts and no delusions or hallucinations.  (R. 390). Although the Plaintiff seemed depressed and had a history of suicidal thoughts, she never attempted suicide and denied a current intent.  (R. 390).  Dr. Liggon reported that the Plaintiff had fair insight and average intelligence and rated her GAF score at forty-eight.[1]  (R. 390-91).

---

[1] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF

On June 30, 2003, Roger K. Fretz, Ph.D., a state agency reviewing psychologist, completed a mental residual functional capacity (MRFC) assessment form in which he opined that the Plaintiff's mental condition caused moderate limitations in her ability to perform daily activities and maintain concentration, persistence and pace; moderate difficulties in her ability to maintain social functioning; and one to two episodes of decompensation. (R. 206-20). With regard to work-related mental activities, Dr. Fretz concluded that the Plaintiff was "moderately limited" with respect to: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and responding appropriately to changes in the work setting. (R. 221-22). Dr. Fretz considered the Plaintiff to be "not significantly limited" with respect to the other fourteen mental activities on the form. (R. 221-22).

On July 9, 2003, in an attempt to withdraw the Plaintiff from Oxycontin addiction, Dr. Levin changed her medication regimen. (R. 353, 435). The Plaintiff was subsequently admitted to the hospital, however, and treated for aspiration pneumonia and hypoxia secondary to medication narcosis. (R. 339-66, 371-75, 455-60). She admitted a history of sexual abuse, using heroin and crack cocaine, alcohol abuse and driving while intoxicated. (R. 358).

The attending physician, Rajnikant P. Lad, M.D., noted that she probably under-reported her drug use. (R. 358). When she was discharged eight days later, the Plaintiff described her

---

MENTAL DISORDERS 34 (4th ed. text revision, 2000) (DSM).

mood as "good;" she had normal speech, a better range of affect, intact judgment and goal-directed thought processes; and she denied delusions, hallucinations or suicidal thoughts.  (R. 359-60).  Dr. Lad noted that her GAF, which he rated as thirty upon admission, had increased to fifty-five at discharge.[2]  (R. 360, 362, 456).

The Plaintiff continued treatment with Dr. Levin from July 2003 through July 2004.  (R. 435-48).  In August 2003, her mother reported that she was doing well, could hold a conversation and was less anxious and irritable.  (R. 436).  The Plaintiff reported increased symptoms the following month, yet by October 2003, her fibromyalgia and depression were improving and her mother agreed that she was doing much better.  (R. 439).  In May 2004, Dr. Levin noted that the Plaintiff's health illness profile changed and was "inconsistent with her responses as asked earlier in the session" and that her statements often contraindicated.  (R. 444).  In June 2004, the Plaintiff reported that her pain was stable.  Her GAF remained at sixty.  (R. 446).  Over the course of their treatment, Dr. Levin opined that the Plaintiff was disabled for purposes of her application for public welfare benefits, and in a letter to her attorney.[3]  (R. 451-54, 490-91).

The Plaintiff's relevant  treatment for her physical impairments began, as previously noted, when Dr. Wellman treated her following a fall at work where the Plaintiff injured her left

---

[2]A GAF between 21 and 30 indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. DSM at 34.

[3] We note that the Plaintiff does not contest the ALJ's finding that Dr. Levin's opinion that she is disabled was not supported by the objective medical record, the Plaintiff's noncompliance, and her drug-seeking behavior.  (R. 16).  We also note that the ultimate responsibility for determining whether a claimant is disabled is left to the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).

shoulder.  (R. 156).  X-rays indicated no sign of fracture but minimal separation of the left A-C joint.  *Id.*

The Plaintiff first saw Anthony Bruno, M.D., an orthopaedic surgeon, for pain related to the injury in February 2003.  (R. 135-36).  Dr. Bruno reviewed the x-rays of the Plaintiff's shoulder and concluded they were negative.  (R. 135).  The Plaintiff reported pain in her left arm with impingement positions but generally had a competent cuff.  (R. 135).  The Plaintiff reasonably maintained range of motion of her neck and back, and her arms and legs were normal.  (R. 135).  She had maintained reflexes, a normal sensory exam, and normal vascular supply.  (R. 135).  Dr. Bruno advised her to pushing, pulling, or lifting more than fifteen pounds for six weeks.  (R. 134, 136).  When the Plaintiff requested additional medication, Dr. Bruno advised that he would be extremely cautious when prescribing narcotics.  (R. 136).

At an examination with Ronald Schlansky, M.D., a board-certified rheumatologist, in March 2003, the Plaintiff appeared agitated and repeatedly requested prescription narcotics.  (R. 225).  Dr. Schlansky opined that the Plaintiff's elevated sedimentation rate was not associated with fibromyalgia and would return to normal.  (R. 225).  He expressed concern over her drug-seeking behavior and encouraged her to participate in an aerobic exercise program.  (R. 225).  Dr. Schlansky subsequently reported that the Plaintiff was angry because he would not prescribe narcotics and that she refused to do aerobics.  (R. 228-29).  Thereafter, the Plaintiff requested a referral to a different fibromyalgia specialist.  (R. 134).

The Plaintiff presented multiple complaints to Dr. Bruno during the following months.  (R. 423-24).  Dr. Bruno administered an injection for her shoulder pain, which helped for about

9

one week, and gave her a splint to wear at night for hand pain.  (R. 423-24).  At a May 2003 examination, the Plaintiff had full range of motion in her hips, knees, foot and ankles; normal reflexes, sensation and power; and no atrophy.  (R. 424).  A straight leg raise test was negative. (R. 424).  Although her rotator cuff was tender, her distal evaluation was normal in strength, sensation and range of motion.  (R. 424).  Dr. Bruno advised the Plaintiff to avoid repetitive and overhead use of her left arm, in addition to the previous lifting restrictions.  (R. 424).

In January 2004, the Plaintiff returned to Dr. Bruno complaining of lower back discomfort, but presented no neck or shoulder problems.  (R. 425).  She walked normally, tolerated range of motion in her hips, and had intact reflexes, sensation, power and range of motion in her legs.  (R. 425).  Her back was tender to touch, but Dr. Bruno detected no step off or deformity.  (R. 425).  A straight leg raising test was positive on her right side.  (R. 425).

On March 17, 2004, Plaintiff underwent a right L4 hemilaminotomy and resection of a right L4-5 synovial cyst.  (R. 269-328).  Four weeks later, the Plaintiff's right leg pain had resolved and her physician noted that she was doing well.  (R. 314).  Her surgeon advised her to continue walking but postpone heavy lifting or exercising for three months.  (R. 314).  In July 2004, the Plaintiff returned to Dr. Bruno, who noted that she walked with ease without limping or using an assistive device.  (R. 486).  She tolerated reasonable motion in her hips, knees, feet and ankles, her neurovascular status was grossly normal and her reflexes were maintained.  (R. 486).  The following day, a lumbar spine MRI showed normal alignment and curvature of her lumbar spine without acute fracture or subluxion; well-maintained vertebral body heights and

intervertebral disc spaces; and postoperative changes at L4-L5 with fibrosis extending into the spinal canal and surrounding right L5 nerve root.  (R. 489).

The Plaintiff argues that: (1) the ALJ's hypothetical question to the VE was deficient because it did not include the opinion of a state agency psychologist; (2) the ALJ did not give sufficient weight to the opinions of the Plaintiff's treating psychiatrists; and (3) the ALJ's finding that the Plaintiff could perform light work was not supported by substantial evidence.

### B. Review of the ALJ's decision

### 1.  The ALJ's hypothetical question was proper

The Plaintiff argues that the ALJ erred in not including, in his hypothetical question to the VE, the opinion of Dr. Fretz, the state agency psychologist, regarding her functional limitations.  The opinion to which the Plaintiff refers is a MRFC assessment form.  (R. 221-22). In it, Dr. Fretz, as described above, opined that the Plaintiff was moderately limited in her abilities to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without supervision; complete a normal workweek without interruptions and perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in a work setting.  *Id.*

The Plaintiff's argument fails for two reasons.  First, a hypothetical question must only include all medically undisputed impairments.  *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d. Cir. 1987); *Podedworny v. Harris*, 745 F.2d 210, 218 (3d. Cir. 1984).  The type of undisputed medical impairments the Third Circuit has held should have been included in hypothetical

questions were dizziness and blurred vision, in *Podedworny*, and the "fact of constant and severe pain," in *Chrupcala*.  745 F.2d at 218; 829 F.2d at 1276.  The opinion of a state agency psychiatrist is not a medically undisputed fact, nor does it become one simply because it is the only MRFC assessment in the record.  *See* 20 C.F.R. §§ 404.1527(e)(2), (e)(3), 416.927(e)(2), (e)(3) (describing the Plaintiff's mental limitations as in issue reserved for the ALJ, who is not required to give special significance to not the state agency psychiatrist).

Second, the limitations Dr. Fretz opined appear to be consistent with the hypothetical anyway.  The ALJ gave significant weight to Dr. Fretz's opinion that the Plaintiff was capable of understanding and remembering simple tasks.  (R. 16).  Dr. Fretz found the Plaintiff only moderately limited in a number of mental ability areas and not significantly limited in most areas.  (R. 221-22).  Those moderate mental limitations that Dr. Fretz identified are consistent with the limitations the ALJ included in the hypothetical:  that the Plaintiff had mild to moderate restrictions on her ability to concentrate, pay attention, and interact with others.  (R. 16, 547).  The jobs identified by the VE in response to the hypothetical question were unskilled jobs demanding "little or no judgment to do simple duties that can be learned on the job in a short period of time."  (R. 549).  20 C.F.R. §§ 404.1568(a), 416.968(a).  The VE testified that even if the Plaintiff's limitation on her ability to concentrate and pay attention increased to moderate to severe levels, she would not be precluded from performing the unskilled jobs the VE identified.  (R. 548).

**2.  The ALJ did not err in granting little weight to the opinions of two**

**treating psychiatrists**

The Plaintiff next argues that the ALJ erred in granting little weight to the psychological evaluations of Drs. Liggon and Lad.  (R. 16, 388-92, 256-58.  Specifically, the Plaintiff contends that the ALJ erred in assigning limited weight to Dr. Liggon's June 20, 2003 GAF score of forty-eight and to Dr. Lad's  July 15, 2003 GAF score of thirty.  (R. 16, 391, 257). The ALJ assigned the scores little weight because he found them to have been rendered at a time of symptom exacerbation, due to the Plaintiff's recent breakup with her girlfriend, and inconsistent with subsequent treatment and stabilization.  (R. 16).

The Plaintiff argues that the GAF scores were not the result of symptom exacerbation because her breakup was in February 2003, a few months before the two evaluations.  (R. 358). While the ALJ may have cited the wrong reason for the Plaintiff's symptom exacerbation, as the Commissioner points out, Dr. Lad assessed the GAF score of thirty during the Plaintiff's admission to a hospital for lethargy related to methadone treatment (for pain) and the score did not remain that low for long.  (R. 256-57, 339, 353, 490).  The Plaintiff's chief complaint to Dr. Lad at the time was "I don't know how I got here."  (R. 256).  Four days later, Dr. Lad assessed a GAF score of fifty; twelve days after that, Dr. Lad assessed a GAF score of fifty-five.  (R. 362, 260).  This constitutes substantial evidence that the Plaintiff's GAF score of thirty was not stable and was indeed, as the ALJ determined, temporarily exacerbated and therefore not due significant weight.

13

Dr. Liggon examined the Plaintiff only once, when the Plaintiff was contemplating transferring to her care, and her report consists mainly of documenting the Plaintiff's subjective complaints and history. (R. 388-92). As a consequence, Dr. Liggon's opinion is entitled to less weight. *See* 20 C.F.R. 404.1527(2)(ii), 416.927(2)(ii)(stating that "the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Dr. Liggon's opinion does not reflect the kind of "expert judgment based on a continuing observation of the patient's condition over a prolonged period of time" the Third Circuit considers important in assigning weight to treating physicians' opinions. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987).

There is also substantial evidence that Dr. Liggon's June 20, 2003 GAF score of forty-eight is not supported by the medical record, is contradicted by other GAF assessments, and is inconsistent with subsequent improvement with treatment. (R. 16). A score of forty-eight indicates serious symptoms. DSM 34 . However, Dr. Liggon noted that the Plaintiff's thoughts were coherent, she was alert and oriented, and had no current plan of suicide or history of attempts, although the Plaintiff claimed recurrent suicidal ideation. (R. 390). In addition, Dr. Levin, the Plaintiff's treating physician, consistently assessed GAF scores of sixty for the Plaintiff over the sixteen month period from March 2003 through June 2004.[4] (R. 205, 427-32, 446). Thus, Dr. Liggon's GAF score is contradicted by the medical record. In addition, Dr. Lad, as

---

[4] While Dr. Levin did not assign a GAF score during June 2003, the time during which Dr. Liggon met with the Plaintiff, he did assign scores of sixty in May 2003 and April 2004. (R. 432, 446).

noted above, assessed a GAF score of fifty-five upon the Plaintiff's hospital discharge on July 30, 2003.  This constitutes substantial evidence supporting the ALJ's determination that Dr. Liggon's GAF score was not consistent with subsequent treatment.  (R. 360, 16).

### 3. Substantial evidence supports the ALJ's conclusion that the Plaintiff was capable of light work

The Plaintiff's last argument is that the ALJ erred in finding her capable of light work. Light work requires lifting no more than twenty pounds at a time with frequent lifting or carrying of ten pounds, "a good deal" of walking or standing, or sitting and using arm or leg controls.  20 C.F.R. §§ 404.1567(b), 416.967(b).  The ALJ found that the Plaintiff had the RFC to lift and carry ten pounds frequently and twenty pounds occasionally, and push and pull as much as she could lift and carry.  (R. 16).

The Plaintiff points out that on February 4, 2003, upon first meeting the Plaintiff regarding a left arm injury she suffered from a January 2003 workplace fall, Dr. Bruno gave her a note for work indicating that she could not push, pull, or lift more than fifteen pounds.[5]  (R. 134-35).  On May 2, 2003, Dr. Bruno gave the Plaintiff another such note.  (R. 133).  Dr. Bruno's May 2, 2003 note did not, as the Plaintiff contends, indicate that the restriction was indefinite.  (Doc. 10 at 15).  In fact, Dr. Bruno noted that the Plaintiff's restrictions were related

---

[5] The Plaintiff also points out that the ALJ incorrectly stated that the Plaintiff's physician restricted her to lifting and carrying no more than *twenty-five* pounds in February 2003 when, in fact, Dr. Bruno had restricted the Plaintiff to lifting and carry no more than *fifteen* pounds.  (R. 15).  Doc. 10 at 15.  The impact of this misstatement is mitigated by the fact that the ALJ did, however, correctly state that Dr. Bruno restricted the Plaintiff in May 2003 to lifting and carrying no more than fifteen pounds, a restriction he gave significant weight.  (R. 15-16).  Moreover, the ALJ's misstatement was confined to functional limitations that predate the Plaintiff's alleged disability onset date. (R. 134, 112).

to her workplace injury and stated that he had suggested the Plaintiff try to return to work with a tolerable level of function.  (R. 137).  Dr. Bruno did not indicate any functional limitations after seeing the Plaintiff again in January, February, March, and July of 2004, and in fact specifically stated that the Plaintiff did not "describe anything going on at the neck or shoulder to any great degree."  (R. 425).

While the ALJ gave significant weight to Dr. Bruno's May 2003 assessment of the Plaintiff's functional limitations, he did not abide by Dr. Bruno's fifteen pound limitation, but instead found the Plaintiff limited to occasional lifting or carrying of twenty pounds and frequent lifting or carrying of ten pounds.  (R. 16).  It was, in fact, the ALJ's prerogative to do so.  *See* 20 C.F.R. §§ 404.1527(e)(2), (e)(3), 416.927(e)(2),(e)(3) (stating that "although [the ALJ] will consider opinions from medical sources on issues such as . . . residual functional capacity . . . the final responsibility for deciding these issues is reserved to [him]").  The Regulations further instruct the ALJ to assess a claimant's RFC on the basis of all the relevant evidence.  20 C.F.R. §§ 404.1545(a)(3), 416.945 (a)(3).

The Plaintiff contends that her subjective complaints provided evidence that she did not retain the RFC for light work.  The Plaintiff stated that lifting, pulling, pushing, bending, standing, walking, and temperature extremes all cause her pain.  (R. 83).  A claimant's allegations alone, however, do not establish that she is disabled.  20 C.F.R. §§ 404.1529(a), 416.929(a).  While the ALJ must seriously consider a claimant's subjective complaints, it is within the ALJ's discretion to weigh such complaints against the medical evidence, and to reject

16

them. *See* 20 C.F.R. §§ 404.1529, 416.929 (explaining how the Commissioner evaluates a claimant's symptoms, including pain).

When compared to the objective medical evidence, the Plaintiff's subjective complaints do not hold up.  In February 2003, despite left arm pain, the Plaintiff had reasonably maintained range of motion in her neck, back, knee and hip; maintained reflexes; and a normal sensory exam.  (R. 135).  In May 2003, she had full range of motion in her hip, knees, foot and ankles; normal reflexes, sensation and power; and no atrophy.  (R. 424).  In December 2003, the Plaintiff had equal deep tendon reflexes, no atrophy and no sensitivity to touch.  (R. 426). In January 2004, she had range of motion in her hips, intact reflexes, sensation, power and range of motion in her legs.  (R. 425).  Although the Plaintiff required surgery to remove a synovial cyst in March 2004, she recovered well and her right leg pain resolved with only intermittent parasthesia.  (R. 314).  After the surgery, the Plaintiff's right leg pain had resolved, although she complained of low back pain.  (R. 314).  Upon examination, however, she had full (5/5) strength in her lower extremities, symmetrical deep tendon reflexes, and walked without a limp or using a cane.  (R. 314, 486).  The Plaintiff complained of discomfort walking, but her physician urged her to continue walking.  (R. 314).

Finally, the Plaintiff's history of drug-seeking behavior cannot be ignored when discussing the ALJ's assessment of her credibility regarding the complaints of pain she made to

physicians.[6]  In March 2003, Dr. Schlansky stated that while he was obtaining the Plaintiff's

history, she repeatedly requested prescriptions for narcotics.  (R. 225-26).  Dr. Schlansky noted

that the Plaintiff had previously been treated with narcotics for her fibromyalgia, and expressed

concern that "fibromyalgia is not usually treated with potent narcotic medications."  *Id.*  In April

2003, Dr. Schlansky noted that the Plaintiff was "drug-seeking" and angry that he would not

give her narcotics.  (R. 228-29).  That same month, Dr. Levin noted that the Plaintiff abused her

medications and was "spacey."  (R. 428).   Dr. Levin noted in May 2003 that he suspected the

Plaintiff was pressuring her mother to give her more Klonopin and noted that he was

considering referring her for detox treatment.  (R. 432).  Four days later, following a call from

the Plaintiff's mother indicating  that the Plaintiff had fallen and was slurring her speech, Dr.

Levin stated that she was too difficult to manage on an outpatient basis and that he was

considering terminating her care if she refused to go to the hospital.  (R. 432).  He wrote that

the Plaintiff was "zombied out" and could not stay awake.  *Id.*  In May 2004, Dr. Levin noted

that would have to cut out some medication and reported that the Plaintiff's statements were

inconsistent and often contraindicated.  (R. 444).  This constitutes substantial evidence

---

[6] While the Plaintiff's drug-seeking behavior and over-medicating might appear, at first blush, to lend itself to an independent basis for disability, we note that an individual is not considered disabled under the Act if alcoholism or drug addiction is a contributing factor material to the Commissioner's determination that the individual is disabled.  That is, a claimant is only disabled if she has another disability (in addition to the drug or alcohol addiction) that would exist even if she were not addicted to drugs or alcohol.  42 U.S.C. § 423 (c)(2)(C)(2004).  At any rate, the Plaintiff did not bring it up the separate issue of drug addiction in either her application or her brief in the instant action, and Dr. Levin, her treating physician, stated that the Plaintiff's problems with drugs were in the past and that she claimed no recent problems.  (R. 490).

supporting the ALJ's determination that the Plaintiff's subjective complaints to her physicians regarding her pain were not fully credible.

## V.  RECOMMENDATION.

Based on the foregoing, it is respectfully recommended that the Plaintiff's appeal be DENIED.

s/ Thomas M. Blewitt
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: March 22, 2006**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBRAANNE DEFRANCESCO, | : | CIVIL ACTION NO. **3:CV-05-713** |
| | : | |
| Plaintiff | : | (Judge Munley) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| JOANNE B. BARNHART, | : | |
| Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant | : | |

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **March 22, 2006.**

Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within ten (10) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection

is made and may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge.  The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the
magistrate judge, making his or her own determination on the basis
of that record.  The judge may also receive further evidence, recall
witnesses or recommit the matter to the magistrate judge with
instructions.


      **s/ Thomas M. Blewitt**

      **THOMAS M. BLEWITT**

      **United States Magistrate Judge**


**Dated: March 22, 2006**